# Kraus *v.* American Tobacco Co. (et al.), Appellant.

*Corporations—Foreign corporations—Doing business in State— Sales manager, salesmen and jobbers—Sales by sample—Service of process—Setting aside service.*

1. A foreign corporation is doing business in Pennsylvania, and is subject to process therein, when it appears that it has a sales manager with an office in Pennsylvania; that such manager has power to employ salesmen and bind the corporation in many ways; that a large force of salesmen are employed in the State, who make sales in small amounts to retailers from stock carried by themselves, but obtained from jobbers in the State, and who forward the orders which they obtain from retailers to the company's office without the State, which orders are forwarded in turn to jobbers in the State by whom they are filled; and that, including automobiles owned by the company and used by salesmen, the company had $15,000 invested within the State.

2. In such case, although the salesmen made no profit on the resale of goods which they purchased from the jobbers in the State, the company did, as the resales were made at the jobbers' prices. Such sales were not sales by sample.

Argued October 9, 1925. Appeal, No. 165, March T., 1925, by defendant, from order of C. P. Allegheny Co., Jan. T., 1923, No. 700, refusing to set aside service of process, in case of Samuel Kraus v. American Tobacco Co. and R. H. Kelly. Before MOSCHZISKER, C. J., SIMPSON, SADLER and SCHAFFER, JJ. Affirmed.

Trespass for conspiracy to maintain improper prices. See 283 Pa. 146.

Proceedings under Act of March 5, 1925, P. L. 23, to determine jurisdiction of court in first instance. Before HAYMAKER, J.

Rule to show cause why service should not be set aside, discharged. Defendant, American Tobacco Co., appealed.

*Error assigned* was, inter alia, order, quoting record.

*John G. Frazer*, with him *Reed, Smith, Shaw & McClay*, for appellant.—Defendant was not engaged in interstate business: People's Tobacco Co. v. Tobacco Co., 246 U. S. 79; P. & R. R. R. v. McKibbin, 243 U. S. 264; St. Louis S. R. R. v. Alexander, 227 U. S. 218; Portland Cement Co. v. Com., 62 L. Ed. 549; Green v. R. R., 205 U. S. 530; Mearshon v. Lumber Co., 187 Pa. 12; Federal Glass Co. v. Lorentz, 49 Pa. Superior Ct. 585; Lambert Hoisting Engine Co. v. Coal Co., 17 Pa. Dist. R. 227.

*Leonard S. Levin*, for appellee.—To constitute a doing of business by a foreign corporation in Pennsylvania, it is sufficient if the corporation either has an office here, or a general agent with authority to bind the corporation in certain respects, or that it has any portion of

its capital invested here: Fertilizer Co. v. Kelly, 10 Pa. Superior Ct. 565; Kernchen Co. v. English, 70 Pa. Superior Ct. 293; Nonantum v. Worsted Co., 3 Pa. Dist. R., 428; Bragdon v. Campbell Co, 19 Pa. C. C. R. 305; Blakeslee Mfg. Co. v. Hilton, 5 Pa. Superior Ct. 184; Ice Mfg. Co. v. Armour, 12 Pa. Superior Ct. 443; Com. v. Nolde, 44 Pa. Superior Ct. 111; Delaware Co. v. Ry. Co., 204 Pa. 22; Fashion Co. v. Brobst, 18 Lancaster Law Review 231.

OPINION BY MR. JUSTICE SCHAFFER, November 23, 1925:

As succinctly stated by appellant's counsel, the question here involved is: Under the facts shown by the record, was the business conducted in Pennsylvania by the American Tobacco Company, a nonregistered foreign corporation, an interstate business, or was it an intrastate business such as to render the company subject to suit in Pennsylvania?

The defendant prior to January 11, 1917, had been registered as a foreign corporation doing business in this State and in accordance with the requirements of law had appointed the secretary of the Commonwealth as its agent for the service of process. On the date named, it filed with the proper official a paper certifying that it had ceased to do business in Pennsylvania and in the same paper attempted to revoke the prior appointment of the secretary of the Commonwealth as its agent for service.

In October, 1922, this suit was commenced and the writ was served on the secretary of the Commonwealth. Defendant moved to have the service set aside, which was done in the court below, but on appeal (283 Pa. 146) we reversed this action and remanded the case for further consideration in the light of our opinion, with the result that the court held the service valid, and we have this appeal by defendant.

From the record we ascertain that the defendant, which manufactures outside of this State various brands

of tobacco, conducted its operations in Pennsylvania in this manner: It maintains a sales organization consisting of a general district sales manager, a field sales manager, head salesmen and retail salesmen. Under the field sales manager were six head salesmen called division managers, who operated in separate territorial districts, and under each of these division managers were six retail salesmen. It was the duty of the field sales manager to oversee the activities of the salesmen in an effort to increase the sale of the company's products in his territory. The company recognized as its customers only jobbers, and any merchandise shipped to a retailer, no matter by whom the order was taken, was charged by the company to a jobber in the territory, named by the dealer, after the jobber approved the credit of the retailer. The salesmen took orders of two kinds; those which were delivered to a jobber and were filled by him directly out of stock carried by him and secondly those calling for what were known as "drop shipments." The latter consisted of orders for a quantity of merchandise sufficiently large to be shipped direct from the factory to the retailer. All orders were approved and accepted by the company in New York and the goods were shipped f. o. b. factory.

The field sales manager had an office in Pittsburgh rented in the name of an employee in the sales department of the company in New York; the rent was paid by the company. On the office door were the names of the field sales manager and his assistant; the name of the company did not appear. The office furniture was owned by the company.

Each salesman had a Ford car for use in visiting customers. These cars did not have the name of the company on them, but did have a facsimile of certain products of the company such as "Lucky Strike Cigarettes" or "Bull Durham" tobacco. There were about thirty-five of these salesmen's cars in Pennsylvania. The upkeep of these cars was paid by the salesmen in the first instance,

but refunded to them by the company. When an order was taken by a salesman, it was sent to the office of the district sales manager and then to the New York office.

Each salesman was supplied by the company with a contingent fund of from $60 to $100. The purpose of these funds was to stir up trade among the retail dealers. With this money the salesmen purchased from the company's jobbers small quantities of the various products of the company which they carried round with them in their automobiles. When a salesman visited a retailer and found that he did not carry or did not have in stock certain of the company's products, the salesman would sell to the retailer for cash out of the stock he carried in his car not more than three packages of any given product at the price the salesman had paid the jobber. The average daily cash sales of each salesman amounted to approximately $5 and his drop shipments averaged $150 per day.

The company had no bank account in Pennsylvania. Its employees were paid by check from New York. The stationery used in the office did not bear the name of the company, but that of the individual using it. No books were kept in Pennsylvania; the name of the company did not appear in the telephone book; the telephone was in the name of its manager and he contracted for it; it was paid for however by the company. Salesmen were employed by the district sales manager subject to the ratification of the company's officials in New York. The court below found that, including the value of the salesmen's automobiles, the company had in the neighborhood of $15,000 employed in Pennsylvania.

We think that what has been outlined constituted a doing of intrastate business; as was said by the learned trial judge in his opinion, "These various transactions show a continuous prosecution here of the ordinary business of the company and not merely isolated business transactions. The company's field sales manager was not a mere local agent of the company to secure

orders here for interstate shipment; he was in charge of many employees; he selected the salesmen under him, passed on their fitness and recommended their appointment to the company, which recommendations seem never to have been rejected; he contracted for the use of a telephone for himself and the other employees and opened an account with the Western Union Telegraph Company; orders for the sale of the company's merchandise were received at his office; he had the use of an office for himself, a head salesman and one or two stenographers, all expenses being paid by the company; it had property and capital employed in this State and through its employees it purchased and resold for cash certain merchandise in this State." While it is true the salesmen made no profit on these resales, yet the company did, as the resales were made at the jobber's price.

This case is readily distinguishable from People's Tobacco Company, Ltd., v. American Tobacco Co., 246 U. S. 79. In that case (p. 85) "the American Tobacco Company was selling goods in Louisiana to jobbers, and sending its drummers into that state to solicit orders of the retail trade, to be turned over to the jobbers, the charges being made by the jobbers to the retailers. It further appears that these agents......did not have the right or authority to make sales on account of the defendant company, collect money or extend credit for it. ......As to the continued practice of......sending its soliciting agents into that state......the agents having no authority beyond solicitation, we think the previous decisions of this court have settled the law to be that such practices did not amount to that doing of business which subjects the corporation to the local jurisdiction for the purpose of service of process upon it." Alpha Portland Cement Co. v. Com. of Massachusetts, 000 U. S. 000, 69 L. Ed. 549, is also apart from the instant case on its facts. There it was sought to impose an excise tax on the foreign corporation whose agents only solicited orders for cement, and in Real Silk Ho-

siery Mills, Inc., v. City of Portland, 000 U. S. 000, 69 L. Ed. 639, the agents were likewise only solicitors of interstate business; also in Green v. Chicago, B. & Q. R. R. Co., 205 U. S. 530, 533, "the business shown was ......in substance nothing more than that of solicitation." The rule announced in these cases was recognized by us years ago in Mearshon & Co. v. Pottsville Lumber Co., Ltd., 187 Pa. 12, where it was pointed out that (p. 16) "The words 'doing any business,' as used in the act, should not be construed to mean taking orders or making sales by sample by agents coming into our state from another for that purpose......[Certain decisions cited] fully establish the rule that a corporation of one state may send its agents to another to solicit orders for its goods or contract for the sale thereof without being embarrassed or obstructed by state requirements as to taking out licenses, filing certificates, establishing resident agencies, or like troublesome or expensive conditions." See also Federal Glass Co., Inc., v. Lorentz, 49 Pa. Superior Ct. 585. Appellant's counsel endeavor to escape the effect of the resale by the salesmen to the retailers of goods purchased from the jobbers by the assumption that this is the same as a sale by sample and that the company derives no profit in these cash sales, as the tobacco is always purchased by the salesmen from a jobber and resold at the latter's price. Obviously these transactions as we have set them forth from appellant's own description of them are not sales by sample and it is not accurate to say that the company received no profit, for it received the profit on the original sale to the jobber and if thirty-five salesmen sell $5 worth a day, the total of the sales, $175 a day, over $50,000 per year, must net a not inconsiderable profit to the company through the jobbers.

More nearly in point than any case cited by counsel is that involving the Northwestern Consolidated Milling Co. in Cheney Bros. Co. v. Massachusetts, 246 U. S. 147, 155. "This company was incorporated under the laws

of Minnesota, operates flour mills there, and sells the flour to wholesale dealers throughout the country. It has an office in Massachusetts where it employs several salesmen for the purpose of inducing local tradesmen to carry and deal in its flour. These salesmen solicit and take orders from retail dealers and turn the same over to the nearest wholesale dealer, who fills the order and is paid by the retailer. Thus the salesman, although not in the employ of the wholesaler, is selling flour for him. Of course this is a domestic business,—inducing one local merchant to buy a particular class of goods from another,—and may be taxed by the state, regardless of the motive with which it is conducted." It is true the salesmen of American Tobacco Company do not turn over their orders to the jobbers but the result of the system used is the same as though they do. They actually sell the jobber's goods and when they take orders, these orders are filled through the jobbers. Certainly this amounts to inducing tobacco retailers to buy American Tobacco Company products from local jobbers.

The order of the court below is affirmed.

Mr. Justice KEPHART took no part in the decision of this case.